IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KAVON B. GRAY,                          :
                                        :
            Plaintiff,                  :
                                        :
    v.                                  :       Civ. No. 13-1055-RGA
                                        :
MORGAN STANLEY SMITH BARNEY,  :
                                        :
            Defendant.                  :

Kavon B. Gray, Wilmington, Delaware. *Pro Se* Plaintiff.

Jody Barillare, Esquire, Morgan Lewis & Bockius LLP, Wilmington, Delaware.  Counsel for Defendant.

**MEMORANDUM OPINION**

January 29 , 2016
Wilmington, Delaware

*Richard G. Andrews*

**ANDREWS, U.S. District Judge:**

Plaintiff Kavon B. Gray, who appears *pro se*, filed this action, alleging

employment discrimination by reason of race pursuant to Title VII of the Civil Rights Act

of 1964 and 42 U.S.C. § 1981.[1]  (D.I. 1).  The Court has jurisdiction pursuant to 28

U.S.C. § 1331.  Defendant Morgan Stanley Smith Barney ("MSSB") moves for summary

judgment.  (D.I. 66).  Plaintiff opposes.  Briefing on the matter has been completed.

(D.I. 67, 69, 71).

## I.      LEGAL BACKGROUND

Gray alleges employment discrimination by reason of race, subjection to a

hostile work environment, and retaliation.  Gray filed a charge of discrimination with the

U.S. Equal Employment Opportunity Commission, which issued a notice of right to sue

at Gray's request on March 21, 2013.  Gray filed the complaint on June 12, 2013.

The complaint alleges work related race discrimination, as follows:  (1) Gray was

the only employee in the research department who was not invited to attend an annual

retreat at a golf course in New York; (2) she was incorrectly advised of the number of

days allowed for bereavement following the deaths of her grandmother and great

grandmother; (3) her supervisor, Christina Shorts, intentionally docked her a week's

pay; (4) Gray is the only employee not allowed to take time off work with two days or

less notice; (5) Gray was the only person subjected to Shorts' rule that Gray (who

worked an adjusted schedule during the summer months) email Shorts every morning

and evening upon Gray's arrival and departure; (6) in July 2012, Gray was not

---

[1]The relevant standards for race discrimination are the same under Title VII and
42 U.S.C. § 1981.  *See Jones v. School Dist. of Phila.*, 198 F.3d 403, 410 n.3 (3d Cir.
1999).

promoted or offered a position in research communications; (7) in July 2012, Shorts and Laura Thomas moved Gray's seat "for no reason at all" when it was a known fact that Gray had the "best seat and view in the building"; (8) MSSB did not support Gray's decision to obtain a Series 7 license; (9) Shorts' year-end review of Gray, conducted January 17, 2013, included comments and remarks that were insulting, defamatory, and retaliatory; and (10) Gray performed the same tasks as another employee, but was not given equal pay.[2]

## II.   FACTUAL BACKGROUND

Gray, who is African American, was hired in October 2007 as an administrative assistant in Defendant's Wilmington, Delaware office. She works for the post merger organization now known as Morgan Stanley Smith Barney.[3] (D.I. 67, Ex. A, 9:21-10:3, 11:10-19; Exs. 1, 2). Gray has taken college courses, but does not have a college degree or any certifications. (*Id.* at Ex. A, 5:16-23, 7:9-11; Ex. 1). As an administrative

---

[2]The parties do not address this last issue in the motion for summary judgment. Gray states that she performed the same tasks as Phoebe Shieh, a communications associate, but was not given the title, perks, or salary. (D.I. 1 at 6). During Gray's deposition, she testified that Shieh was one of two Wilmington employees who held a license required to perform work on a system that contained sensitive information. (*See* D.I. 67, Ex. A, 33:1-8). Gray testified that she did not perform that task. (*Id.* at 33:10). In addition, there is no evidence of record of Shieh's salary for comparison to Gray's salary.

[3]Gray was originally hired by Smith Barney, a division of Citigroup Global Markets Inc., that was owned by Citigroup Inc. On June 1, 2009, Morgan Stanley & Co. Incorporated and Citi combined the Global Wealth Management Group of Morgan Stanley and Smith Barney into a new joint venture which would own Morgan Stanley Smith Barney, LLC, a newly formed investment advisor and broker-dealer. Eventually, Morgan Stanley became the sole owner of Morgan Stanley Smith Barney. (*See* D.I. 67, n.2 and Ex. A, 16:18-24).

assistant, she holds a full-time position. (*Id*. at Ex. A, 10:16-12:14; Ex. 1). While employed with MSSB, Gray has received regular salary increases; her salary has never been reduced. (*Id*. at Ex. A, 22:11-23).

Gray initially reported to Alex Ergon, then to Kevin Johnson, and now reports to Christina Shorts, her current manager. (*Id*. at Ex. A, 23:4-15). Shorts reports to Laura Thomas. (*Id*. at Ex. A, 23:16-17; Ex. 3). Gray has little interaction with Thomas. (*Id*. at Ex. A, 41:14-16). She used to handle Thomas' travel, but, at some point in time, the task was completely removed from Gray. (*Id*. at Ex. A, 41:17-42:19).

Gray's current duties include supporting the entire GIMA (global investment manager analysis) research staff. (*Id*. at Ex. A, 28:19-22). Gray performs clerical tasks such as booking travel, preparing and processing expense reimbursements, answering phones, ordering office supplies and refreshments, processing mail, reserving conference rooms, and arranging for office machine repairs and carpet cleaning. (*Id*. at 29:14-32:11). Gray is also assigned to work on various other projects. (*Id*. at 29:23-30:9, 59:5-8).

Gray testified that she should have been given the position of research communications associate. (*Id*. at 86:24-92:16). Gray has not held any other positions at MSSB other than the administrative assistant position, and did not apply for any position in research communications. (*Id*. at 16:9-17, 86:24-87:9). She explained that in 2008, she was asked if she could handle research communications associate tasks in addition to her regular job and, within a few days, she began training for the job. (*Id*. at 87:11-88:8). Gray was told by then research communications manager Jim Forsyth how well she was doing and that the more she learned, the more it would be perfect to

3

transition to the communications associate. (*Id.* at 89:8-90:24). Gray testified that, due to the responsibilities she assumed, other employees did not know she was an administrative assistant and thought she was a communications associate. (*Id.* at 89:20-90:3). Gray testified that she did the job proficiently and performed the job for years, but did not have the position title or benefits of the position. (*Id.* at 90:7-24).

Gray testified that her research communication duties included all the links uploading, called SBLinks. (*Id.* at 33:10-22). This task comprised a large portion of Gray's duties for research communications, but, after the merger between Morgan Stanley and Smith Barney, the SBLinks website was shut down and something else was used. (*Id.* at 37:8-18; 93:9-94:7). A New York team took over responsibility for managing the new website which included tasks Gray had performed for the communications team. (*Id.* at 37:8-38:16, 93:18-94:13). Gray met with Thomas and Shorts on July 9, 2012, and they informed Gray that she would no longer be performing research communications tasks; that the tasks would be performed by someone else. (*Id.* at 92:17-93:5). Thomas and Shorts distributed some of Gray's tasks to communications associate Shieh. (*Id.* at 96:1-18). Gray testified that she never submitted an application for the communications associate position because the position was never formed or created. (*Id.* at 91:9-92:9). As Gray explained, "things got tossed, turned, we started merging, systems were converting, people were leaving left and right . . . [and the position] was never created." (*Id.* at 92:3-9).

Gray filed a charge of discrimination with the EEOC on August 24, 2012. (D.I. 1). She testified that a hostile work environment existed after she participated in mediation at the EEOC on December 3, 2012. (D.I. 1 at 8; D.I. 67 Ex. A at 112:20-

113:22). Gray explained that when she returned to work, "there was no speaking, no hello, no good morning, just small little things that just were unnecessary." (*Id.* at 114:3-7). Co-workers were angry with her, Gray's team did not acknowledge her thirtieth birthday (but another area surprised her when they found out Gray's team was not going to do anything) and, not long after her birthday, another co-worker's birthday was acknowledged. (*Id.* at 114:15-116:15; 117:1-119:24).

Shorts performed Gray's 2012 year-end review on January 17, 2013. (D.I. 1 at 8). While Gray received a "meets expectations" rating on her 2012, 2013, and 2014 performance reviews (D.I. 67 at Ex. A, 83:2-11, 83:18-20, 84:16-18; 86:7-18; Exs. 9 (2012); 11 (2013); 12 (2014)), she testified that the 2012 review was negative in tone and contained unnecessary comments. (*Id.* at Ex. A, 63:24-73:15; Ex. 9).

Gray testified that she wanted to obtain a Series 7 license when it became clear to her how important it is in the firm for advancement in the field of finance and investment. (*Id.* at Ex. A, 101:6-16). In Gray's 2012 performance review, Shorts stated that Gray's current position does not "necessitate this type of series therefore the firm is not supportive of this request." (*Id.* at Ex. A, Ex. 9). Gray was informed that MSSB would not pay for her to obtain the Series 7 license and testified that, although she was not one hundred percent sure, she assumed that other non-exempt employees had their Series 7 licenses paid for by MSSB. (*Id.* at 101:17-106:13). Gray acknowledged that having a Series 7 license was not a legal requirement for her position as an

5

administrative assistant and the lack of a Series 7 license did not prevent her from performing her current job duties.[4] (*Id.* at 108:22-109:18).

Gray testified that retaliation occurred after she filed the instant lawsuit on June 12, 2013, when MSSB made an effort to have her short-term disability claim denied following November 4, 2014 surgery by providing false information. (*Id.* at Ex. A, 128:14-131:24). Gray was contacted by the short-term disability insurer about her claim that something was "off" and something "didn't sound right." (*Id.* at 131:15-24). Gray's claim was ultimately approved once she clarified that "what they were told was untrue." (*Id.* at 132:1-4).

Gray also testified that she was excluded from a December 10, 2014 departmental holiday luncheon that was sponsored by an outside money manager firm that Gray deals with all the time. (*Id.* at 132:9:133:-4). Gray explained that, other than her, every single employee within research was invited to attend, as the outside company sent an invitation to a "few people," and Thomas personally extended the invitation to everyone in research except for Gray. (*Id.* at 133:4-23). Gray was shown a list of attendees to the luncheon and explained that even if an employee's name was

---

[4]According to Lauren Sanchez, vice president and human resources generalist for MSSB, whether an employee has a Series 7 license does not determine or limit the positions within MSSB for which they may apply, and those employees without a Series 7 license who apply for jobs do not receive less consideration solely on the basis of not having the license. (D.I. 67, Ex. B). Sanchez also states that if an employee is hired into a job where a Series 7 license is preferred or required, MSSB will support and pay for the employee to obtain the Series 7 license after the employee begins the new position, depending upon the position and the extent to which the license would assist the employee in performing the position. (*Id.*)

not on the list, the employee received a verbal invitation from Thomas. (*Id.* at 137:8-19).

Gray described incidents she considered race discrimination prior to the time she filed her charge of discrimination with the EEOC, but testified she never reported any alleged racial discrimination to human resources. (*Id.* at 161:19-163:6). Gray described, "rolling their eyes and not speaking. Small little things that I would do whatever I had to do to just ignore." (*Id.* at 116:18-21). Gray testified that at one time she was not allowed to work from home, but she did not report this alleged discrimination to human relations. (*Id.* at 143:14-18). She has been allowed to work from home for the past few years. (*Id.* at 145:10-24).

Gray referred to a work event golf outing in 2008 or 2009 that everyone, except her, was extended the opportunity to attend. (*Id.* at 141:3-143:13). She also referred to a 2010 conversation with Shorts about flex time when Shorts said, "don't think that you can do anything any different just because you are the only single parent," but only after Gray asked her, "the only what?" (*Id.* at 124:11-125:5). Gray, who was the only African American and single parent in the department, testified that she assumed that Shorts thought she needed to finish her statement and had to come up with something (*e.g.*, single parent) that was unique to Gray other than race. (*Id.* at 125:18-126:5).

The funeral leave policy at MSSB provides that employees are "eligible to receive up to [five] business days of an excused absence with pay upon the death of an immediately family member," defined as a spouse, domestic partner, child, parent, sibling or grandparent. (*Id.* at Ex. A, Ex. 17). In addition, a manager has discretion to allow an excused absence with pay for up to five days upon the death of other relatives. (*Id.*). Gray testified that her grandmother died in December 2010 and, when she

7

returned to work on January 3, 2011, after taking three days of bereavement, she discovered that she was entitled to a total of five consecutive days of bereavement. (*Id.* at Ex. A, 146:22-148:10). Gray asked to take off the two additional days, and Shorts gave her a hard time about it, but Gray informed Shorts that Shorts had not made Gray aware of the five-day bereavement leave policy, and Gray was allowed to take the two days. (*Id.* at 148:14-152:8). Gray's great-grandmother died in 2011, and Shorts allowed Gray three days of bereavement leave. (*Id.* at 152:9-153:10).

In August 2011, Gray received a paycheck that was less than her normal pay. (*Id.* at 156:2-13). Gray contacted human relations and was told she had been docked because she had entered her timekeeping after the deadline to do so. (*Id.* at 156:14-160:24). Gray requested an off-cycle check because under normal policy she would not receive the pay until the next pay period. (*Id.* at 161:1-9). An exception was made, and Gray received an off-cycle check. (*Id.* at 161:10-18).

In July 2012, Gray's seat was moved from what she opined was the "best seat and best view in the building." (*Id.* at 153:15-22). Gray testified that there was no reason for the move and that she was moved because of her race, but has no evidence to support her position. (*Id.* at 153:18-154:20). Gray was moved closer to Shorts, her manager, but testified that she did not have to sit next to anyone to perform her job. (*Id.* at 155:16-156:1).

## III.    LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "could affect the

8

outcome" of the proceeding. *See Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

If the moving party is able to demonstrate an absence of disputed material facts, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment. *Id.* Rather, the nonmoving party must present enough evidence to enable a jury to reasonably find for it on that issue. *Id.* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

With respect to summary judgment in a discrimination case, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987).

MSSB moves for summary judgment on the grounds that Gray cannot establish a *prima facie* case of race discrimination, a hostile work environment, or retaliation, and

9

she cannot establish that MSSB's stated reasons for its actions, as to the race discrimination and retaliation claims, are pretextual.

Gray opposes the motion, but did not support her position in opposition to the motion for summary judgment as she failed to cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact" as is required by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 56(c)(1)(A) & (B). "[T]he court is not obliged to scour the record to find evidence that will support a party's claims." *Perkins v. City of Elizabeth*, 412 F. App'x 554, 555 (3d Cir. 2011); *see also Holland v. New Jersey Dep't of Corr.*, 246 F.3d 267, 285 (3d Cir. 2001) (The court should not "be required to scour the . . . records and transcripts, without specific guidance, in order to construct specific findings of fact" to support its memorandum opinion and order.).

## IV. DISCUSSION

### A. Race Discrimination

MSSB moves for summary judgment on the grounds that Gray cannot make a *prima facie* case of race discrimination and, in the alternative, that she cannot prove that MSSB's stated reasons for its actions are pretextual. Title VII states that "[i]t shall be an unlawful employment practice for an employer to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color,

religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). A plaintiff may prove race discrimination by direct evidence as set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-46 (1989), or indirectly through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[5] "Direct evidence" is evidence sufficient to allow the jury to find that "the decisionmakers placed substantial negative reliance on [race] in reaching their decision." *Price Waterhouse*, 490 U.S. at 277.

The record does not contain direct evidence of race discrimination. Therefore, the Court turns to the *McDonnell Douglas* burden-shifting framework. Under this framework, Gray must first establish a *prima facie* case of race discrimination by proving that: (1) she is a member of a protected class; (2) she suffered some form of adverse employment action; and (3) this action occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when a similarly situated person not of the protected class is treated differently. *Jones*, 198 F.3d at 410.

If Gray succeeds in establishing her *prima facie* case, the burden shifts to MSSB to proffer "legitimate non-discriminatory" reasons for its actions. *See Reeves*, 530 U.S. at 142. If MSSB meets this burden, the burden again shifts to Gray to demonstrate, by a preponderance of the evidence, that the employer's rationale is pretextual. *Id.* at 142-43. To do this, Gray must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate

---

[5]The Court analyzes Gray's race discrimination claims under the Title VII standard. *See* n.1, *supra*.

reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted). "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Harding v. Careerbuilder, LLC*, 168 F. App'x 535, 537 (3d Cir. 2006) (quoting *Fuentes*, 32 F.3d at 764 (internal citations and other citations omitted)).

MSSB argues that Gray fails to establish a *prima facie* case of discrimination as she did not suffer an adverse employment action, given that she was not fired, demoted, or suspended, her salary was never reduced, and she continued to receive salary increases and positive employment reviews. In a race discrimination claim, an adverse employment action "encompasses all tangible employment actions 'such as hiring, firing, failing to promote, reassignment or a decision causing significant change in benefits.'" *Sherrod v. Philadelphia Gas Works*, 57 F. App'x 68, 73 (3d Cir. 2003) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Reassignment may constitute an adverse employment action for purposes of Title VII. *See Zielinski v. Pennsylvania State Police*, 108 F. App'x 700, 705-06 (3d Cir. 2004) (finding transfer without loss in pay or rank an adverse employment action for Title VII purposes).

MSSB argues that, while Gray claims it failed to promote her to a research communications position, she never applied for such a position. Gray's failure to apply for the position, however, is not fatal to her claim. *See E.E.O.C. v. Metal Service Co.*,

12

892 F.2d 341, 348 (3d Cir. 1990) ("Courts have generally held that the failure to formally apply for a job opening will not bar a Title VII plaintiff from establishing a prima facie claim of [discrimination], as long as the plaintiff made every reasonable attempt to convey his interest in the job to the employer."); *DeMaio v. Bed, Bath & Beyond of King of Prussia, Inc.*, 2005 WL 174842, at *4 (E.D. Pa. Jan. 25, 2005) (holding that a statement to the store manager expressing desire to train for a promotion was sufficient when there was no formal hiring process). MSSB also points to Gray's testimony that an open position in research communications was never created following the merger of companies. Finally, it argues that the failure to support Gray's decision to obtain a Series 7 license was not an adverse employment action because a Series 7 license is not required for the position Gray holds.

Gray responds that she was told to take on research communications responsibilities for eventual transition into a permanent role, but was abruptly stripped of all her communication responsibilities. She also argues she was demoted when she was stripped of her higher and more important responsibilities. Gray, however, ignores her own deposition testimony that, following the merger, a position did not exist or become available in research communications, she continued in her position as an administrative assistant, and that a Series 7 license is not required for the position she now holds. *See Young v. Temple Univ. Hosp.*, 359 F. App'x 304, 310 (3d Cir. 2009) (a failure to create a position and promote employee is not an adverse employment action); *Rogers v. Alternative Res. Corp.*, 440 F. Supp. 2d 366, 375 (D.N.J. 2006) (no adverse employment action when there is no evidence that a certain level of training was required for a promotion, retention or other benefits).

13

Gray also claims that her 2012 year-end review contained "very insulting, defemating (sic), and retaliatory" comments. (D.I. 1 at 8). However, Gray's subjective claims regarding the content of the review do not rise to the level of an adverse employment action, particularly when the overall performance rating for the offending review was "meets expectations."[6]   In addition, there is no evidence of record that Gray's 2012 performance rating negatively impacted her salary or any other aspect of her employment. *See Collins v. Sload*, 212 F. App'x 136, 140 (3d Cir. 2007) (satisfactory performance rating coupled with the failure to demonstrate that rating deprived employee of employment opportunities or otherwise altered the terms of condition of employment does not rise to the level of an actionable violation).  The Court finds that, based upon the evidence of record, no reasonable trier of fact could find the acts Gray complains of rise to the level of an adverse employment action under the second element of the *prima facie* case.

Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

---

[6] Gray described the comments as those stating that she missed deadlines and basically did not do any work. (D.I. 67, Ex. A, 65:1-4). The specific statements she finds objectionable are:  (1) "For 2013 Kavon needs to reach out to the analysts more in regards to helping them with administrative duties as well as work on time management."; (2) "When Kavon is given a project, I think it would benefit her to get the project done as soon as possible or at least ahead of the deadline.  This would show that she is willing to give a project all she has and it will benefit her in the future."; and (3) "When Kavon has no work for the day she needs to proactively reach out to either myself or others in the department to see how she can help." (*Id.* at 65:7-11, 77:8-13, 81:4-8). Gray summarized the second point as "[Shorts] stated that I do not complete projects on time." (D.I. 1 at 8).  Gray then describes two projects, one of which ("the Suit abilities (sic) project") she admits finishing after deadline, although that because her "system was down" and "the process [was] not simple." (*Id.*).

14

which that party will bear the burden of proof at trial.  Because Gray failed to establish

the elements of her *prima facie* case, the Court will grant MSSB' motion for summary

judgment on the race discrimination claim.

In the alternative, even had Gray established a *prima facie* case of race

discrimination, she has not produced evidence from which a reasonable juror could find

that MSSB's reasons for its employment decisions were pretexts for discrimination.

MSSB articulated legitimate, nondiscriminatory reasons for its actions.  There was no

open position for Gray following the merger of companies, and a Series 7 license is not

necessary for the position Gray holds.  Nothing before the Court contradicts MSSB's

proffered reasons for the actions it took.  Nor are its proffered reasons for its actions

weak, incoherent, implausible, or so inconsistent that a reasonable factfinder could

rationally find them unworthy of credence.  *See Sarullo v. United States Postal Serv.*,

352 F.3d 789, 800 (3d Cir. 2003).

Finally, even construing the evidence in the light most favorable to Gray, she has

provided no evidence from which a fact-finder could either disbelieve MSSB's

articulated reasons, or believe that discriminatory reasons were more likely than not the

cause of the employment actions.  *See Williams v. Borough of West Chester, Pa.*, 891

F.2d 458, 460-461 (3d Cir. 1989) (the non-movant must present affirmative evidence--

more than a scintilla but less than a preponderance--which supports each element of

her claim to defeat a properly presented motion for summary judgment).  As there is no

genuine dispute on the dispositive legal issue of whether MSSB had discriminatory

motives, the Court will grant MSSB's motion for summary judgment as to the issue of

employment discrimination by reason of race.

15

## B.     Hostile Work Environment

MSSB argues that Gray's claim of a hostile work environment amounts to
nothing more than a collection of workplace slights, mostly imagined, that fail to come
close to the kind of intentional and pervasive discrimination necessary to support a
hostile work environment claim.  Gray refers to:  (1) her exclusion from the golf retreat;
(2) limited funeral leave; (3) docking of pay; (4) policies regarding requests for leave
and required emails of her arrival and departure from work that only she must follow;
(5) changing her seat location; and (6) co-workers who do not speak to her, do not send
her congratulatory emails, or take her to lunch during the holidays.

A plaintiff can establish a violation of Title VII by proving that discrimination
created a hostile or abusive work environment.  *Clegg v. Falcon Plastics, Inc.*, 174 F.
App'x 18, 25 (3d Cir. 2006) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66
(1986).  In order to establish a hostile work environment claim under Title VII, Gray
must show that:  (1) she suffered intentional discrimination because of her race; (2) the
discrimination was severe and pervasive; (3) it detrimentally affected her; (4) it would
have detrimentally affected a reasonable person of the same protected class in her
position; and (5) there is a basis for vicarious liability.  *Andreoli v. Gates*, 482 F.3d 641,
643 (3d Cir. 2007).

Not all workplace conduct that may be described as harassment rises to the level
of a hostile work environment.  *Clegg*, 174 F. App'x at 25.  Several factors inform that
determination such as the severity of the harassment, the frequency of the harassment,
and the degree of abuse.  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).
Workplace conduct is not measured in isolation; instead, whether an environment is

16

sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (internal quotes and citations omitted). Hence, simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Id.* at 271; *see also Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (noting that the standard for judging hostility under Title VII must be sufficiently demanding so that the statute does not become "a general civility code"). Rather, the plaintiff must show that she was subjected to continuous and repeated acts of harassment. *See Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 863 (3d Cir. 1990).

MSSB contends that Gray has identified the following incidents of supposed harassment:[7] (1) in 2008, she was not invited to attend a company-wide annual golf retreat in which administrative assistants were not usually included; (2) in January 2011, Gray's manager asked her to adhere to MSSB's funeral leave policy by taking off five consecutive days rather than two separate absences; (3) in August 2011, Gray's failure to meet a time entry deadline caused her paycheck to be short by 40 hours; (4) from January 2011 to August 2012, Gray's manager repeatedly requested that Gray give proper notice when taking time off; (5) after MSSB granted Gray's request to work a flexible schedule in the summer to accommodate her children's summer schedule, she

---

[7]MSSB's list is more extensive than that identified by Gray in her opposition. (*See* D.I. 71).

17

was asked by her manager to email upon Gray's arrival at the office; (6) in July 2012, Gray's seat was moved to be closer to her manager; (7) in January 2013, Gray's manager provided a few constructive suggestions in areas where Gray could improve in the coming year but also gave Gray a positive rating on her 2012 performance review; (8) in November 2014, after Gray's surgery, MSSB verified that she followed proper procedure to be eligible for short term disability, but Gray alleges that her manager intentionally provided false information in an attempt to cause denial of the short-term disability claim; (9) in December 2014, Gray was not given a formal invitation, based on her race, to go into the conference room and eat lunch provided to her department by a money manager vendor; (10) during Fall 2013, some people in the department celebrated one employee's birthday but did not celebrate Gray's birthday; and (11) certain employees fail to say good morning or speak to her, or sometimes they roll their eyes. MSSB argues that none of the incidents, alone or collectively, satisfy Gray's burden. Conversely, Gray argues that this is a "text book case of corporate America workplace discrimination."

The incidents, as described by Gray, complain of workplace occurrences, including some slights, over a seven-year period, but they are not what the law could or would describe as severe or pervasive harassment. For example, Gray complains that she was purposefully given "false information" about the funeral leave policy, but the record reflects that Gray was provided five days of bereavement leave as set forth in the MSSB bereavement policy. She complains that Shorts intentionally docked her pay, but the record reflects the shortage was due to Gray's failure to timely submit her time sheet and the shortage was remedied once MSSB was notified. Gray complains

18

that only she was subjected to providing three days notice before taking time off, but she ignores the fact that, on numerous occasions, she was absent from work with little to no advance notice. (*See* D.I. 67, Ex. A at Exs. 5, 6). Gray complains that only she was required to send an email when she arrived and left work, but she omits the fact that this occurred upon her request for a flexible summer work schedule (which she was allowed). The other incidents (*e.g.*, exclusion from golf retreat, seat moved, ignored by co-workers) are not sufficiently serious to rise to the level of harassment or abuse. In addition, Gray fails to show that the behavior complained of created a hostile work environment by unreasonably interfering with her employment or demonstrate any constructive alteration in the terms or conditions or her employment.[8]

While Gray complains of unfair work rules, unfair actions taken by her immediate supervisors, and slights in the workplace, these isolated incidents are insufficient to sustain a hostile work environment claim. After viewing the record in the light most favorable to Gray, and considering the totality of the circumstances, including the paucity of racially charged incidents, the Court concludes that no reasonable jury could find that the claimed harassment was sufficiently severe or pervasive so as to create a hostile working environment. *See e.g.*, *Davis v. Solid Waste Services, Inc.*, ___F. App'x ___, 2015 WL 4978720 (3d Cir. 2015) (to support a claim of a hostile work environment, a plaintiff is required to produce evidence of intentional discrimination that was severe

---

[8]Gray testified that she never reported any incidents of discriminatory conduct to the human relations department prior to filing her complaint with the EEOC. (D.I. 67, Ex. A, 161:19-163:6).

and pervasive).  For the above reasons, the Court will grant MSSB's motion for summary judgment on the issue of a hostile work environment.

### C.   Retaliation

MSSB argues that Gray is unable to establish to establish a *prima facie* case of retaliation.  MSSB states she has not suffered a material adverse employment action, and she cannot prove a causal connection between her protected activities and any adverse employment action.  Gray refers to all acts occurring after the filing of the EEOC charge of discrimination and the filing of this action as retaliation claims.

To establish a *prima facie* claim of unlawful retaliation, Gray is required to show that:  (1) she engaged in a protected activity; (2) MSSB took an adverse action against her; and (3) there was a causal connection between the protected activity and the adverse action taken.[9]  *See Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006).  Title VII defines a protected activity as an instance where an employee has opposed a discriminatory employment practice based upon an individual's race, color, religion, sex, or national origin.  *See* 42 U.S.C. §§ 2000e-2(a)(1); 2000e-3(a).  The plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted).  The court examines the challenged conduct "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"  *Burlington N. &*

---

[9]*See Sherrod v. Philadelphia Gas Works* , 57 F. App'x 68, 73 (3d Cir. 2003) (describing an adverse employment action).

*Santa Fe Ry. Co.*, 548 U.S. at 71 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

With respect to the causation prong, the court considers whether a reasonable jury could link the employer's conduct to retaliatory animus. *See Jensen v. Potter*, 435 F.3d 444, 449 n.2 (3d Cir. 2006) (explaining that "[t]he ultimate question in any retaliation case is an intent to retaliate vel non"). In assessing this, the Court considers the "temporal proximity" between the plaintiff's protected activity and the employer's allegedly retaliatory response, and "the existence of a pattern of antagonism in the intervening period." *Id.* at 450 (quotations and citations omitted). "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Clark Cnty. Sch. Dist.*, 532 U.S. at 273-74 (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (three month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four month period insufficient).

MSSB argues that the retaliation claim fails as a matter of law because Gray failed to establish a *prima facie* case of retaliation. Gray responds that her first review after Shorts learned of Gray's discrimination claims was "completely retaliatory," that MSSB provided false information in an effort to get Gray's short term disability claim denied, she was completely excluded from the company holiday luncheon, and co-workers did not always speak to her.

As previously discussed, the 2012 performance review was not adverse, and it does not support a claim of retaliation. Her complaints that MSSB provided information

21

in an attempt to lead to denial of her short term disability claim in November 2014, that she was not invited to a holiday luncheon in December 2014, and that she was slighted by co-workers, fail to support retaliation claims because the evidence does not support a causal relationship between the EEOC filing of August 24, 2012, the EEOC mediation of December 2, 2012, or the filing of the instant complaint on June 12, 2013 and the actions of which she complains.

Regardless of the date, the temporal proximity of one to two years between Gray's protected activities and the adverse employment actions of which she complains are not the length of time typically considered as unduly suggestive of a causal connection. *See*, *e.g.*, *Lichtenstein v. University of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) (finding seven days unduly suggestive); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (two days); *see also Farrell v. Planter's Lifesavers Co.*, 206 F.3d 271, 278-79 (3d Cir. 2000) (declining to decide whether a three to four week period between the two events would be sufficient-by itself-to support an inference of causation). Finally, the incidents about which Gray complains do not constitute the types of "continuous and extreme antagonistic treatment" necessary to support an inference of causation. *See Allen v. Nutrisystem, Inc.*, 2013 WL 1776440, at *6 (citing *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 306 (3d Cir. 2007)).

Gray has failed to establish the necessary elements of her *prima facie* case and, therefore, she cannot succeed on her retaliation claim. Accordingly, the Court will grant MSSB's motion for summary judgment on the retaliation issue.

## V.    CONCLUSION

For the above reasons, the Court will grant Defendant's motion for summary judgment.  (D.I. 66).  A separate Order consistent with this Memorandum Opinion will be issued.